1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  JERRY T. CRIADO,                          CASE NO. 1:04-CV-5150-AWI-SMS-P

10                        Plaintiff,          ORDER DENYING DEFENDANTS' MOTION
                                              FOR SUMMARY JUDGMENT, AND
11       v.                                   REFERRING MATTER BACK TO
                                              MAGISTRATE JUDGE TO BE SET FOR
12  CALIFORNIA DEPARTMENT                     TRIAL
    OF CORRECTIONS, et al.,
13                                            (Doc. 31)
                          Defendants.
14  _____/

15

16  I.      Defendants' Motion for Summary Judgment

17          A.      Procedural History

18          Plaintiff Jerry T. Criado ("Plaintiff") is a state prisoner proceeding pro se and in forma

19  pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on

20  Plaintiff's complaint, filed January 22, 2004, against Defendants Chapman, Lopez, Todd, and

21  Sullivan ("Defendants") on Plaintiff's claim that they violated the Eighth Amendment by failing to

22  provide him with adequate outdoor exercise for approximately one year.  (Doc. 16.)  On August 5,

23  2005, Defendants filed a motion for summary judgment.  (Docs. 31, 32.)  Plaintiff filed an opposition

24  on January 11, 2006.[1]  (Doc. 37.)

25  ///

26  ///

27

28  _____

    [1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
    Court in an order filed on October 20, 2004.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 14.)

1    B.    <u>Legal Standard</u>

2        Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

3    as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

4    Civ. P. 56©.  Under summary judgment practice, the moving party

5        [A]lways bears the initial responsibility of informing the district court
         of the basis for its motion, and identifying those portions of "the
6        pleadings, depositions, answers to interrogatories, and admissions on
         file, together with the affidavits, if any," which it believes
7        demonstrate the absence of a genuine issue of material fact.

8    <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

9    burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

10   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

11   <u>Id</u>.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

12   motion, against a party who fails to make a showing sufficient to establish the existence of an

13   element essential to that party's case, and on which that party will bear the burden of proof at trial.

14   <u>Id</u>. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

15   case necessarily renders all other facts immaterial."  <u>Id</u>.  In such a circumstance, summary judgment

16   should be granted, "so long as whatever is before the district court demonstrates that the standard

17   for entry of summary judgment, as set forth in Rule 56©, is satisfied."  <u>Id</u>. at 323.

18        If the moving party meets its initial responsibility, the burden then shifts to the opposing

19   party to establish that a genuine issue as to any material fact actually does exist.  <u>Matsushita Elec.</u>

20   <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence

21   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

22   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

23   material, in support of its contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586

24   n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

25   might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477

26   U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630

27   (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

28   ///

2

1   return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

2   (9th Cir. 1987).

3           In the endeavor to establish the existence of a factual dispute, the opposing party need not

4   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6   trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

7   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8   <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9   amendments).

10          In resolving the summary judgment motion, the Court examines the pleadings, depositions,

11  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56©.

12  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable

13  inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

14  opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

15  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

16  party's obligation to produce a factual predicate from which the inference may be drawn.  <u>Richards</u>

17  <u>v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th

18  Cir. 1987).

19          Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

20  that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

21  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

22  trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

23  ///

24  ///

25  ///

26

27

28

3

1       C.      Undisputed Facts[2]

2   1.      Plaintiff Jerry T. Criado was incarcerated at the California Correctional Institution (CCI) in

3           Tehachapi, California, and housed exclusively in the Security Housing Unit (SHU), from

4           June 14, 2002, until his transfer to Salinas Valley State Prison (SVSP) on September 3, 2003.

5   2.      All of the Defendants were employed by California Department of Corrections and

6           Rehabilitation at CCI during the relevant time frame.   Defendant Chapman was a

7           Correctional Counselor II; Defendant Lopez was a Facility Captain; Defendant Todd was

8           Associate Warden; and Defendant Sullivan was Chief Deputy Warden.

9   3.      Prior to his transfer to CCI, Plaintiff was housed at the California Substance Abuse

10          Treatment Facility and State Prison (SATF) in Corcoran, California.

11  4.      On March 14, 2002, Plaintiff was placed in SATF's administrative segregation (ad-seg) after

12          receiving a rules violation report (RVR) for possession of an inmate-manufactured stabbing

13          weapon.

14  5.      Plaintiff was found guilty of the offense and referred to the institutional classification

15          committee (ICC) for a SHU term assessment.

16  6.      On May 16, 2002, Plaintiff appeared before the SATF ICC for a special review.   The

17          committee elected to retain Plaintiff in ad-seg pending his transfer.   The committee assessed

18          and imposed a 15 month aggravated SHU term.   Plaintiff's SHU term was aggravated due

19          to a prior RVR for the same offense,[3] and the committee finding that Plaintiff had established

20          a continued pattern of manufacturing slashing type weapons.   The ICC then referred Plaintiff

21          for a SHU audit and transfer to the SHU at either California State Prison Corcoran or CCI.

22  ///

23

24      [2] Verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment

25  rule if they are based on facts within the pleader's personal knowledge.   Johnson v. Meltzer, 134 F.3d 1393, 1399-
    1400 (9th Cir. 1998).

26

27      [3] Plaintiff's contention that this fact is incorrect because the RVR was approximately ten years old is

28  insufficient to bring the fact into dispute.   The RVR documents that prior RVRs were considered despite being more
    than five years old, and resulted in the imposition of an aggravated SHU term.   (Doc. 32, Exhibit A, Sullivan Dec.,
    p.11.)

7.      On May 23, 2002, Plaintiff was endorsed to the CCI-SHU to complete a determinate SHU term with a release date of March 22, 2003.

8.      On June 20, 2002, Plaintiff appeared in person before the CCI ICC for his initial SHU review.  Exercise yards were discussed with Plaintiff, and the committee elected to place Plaintiff on the sensitive needs yard (SNY) #7.  The committee noted that Plaintiff was a drop-out of the Northern Structure prison inmate gang.  The committee also noted that Plaintiff had a past disciplinary history consisting of notable RVRs for possession of inmate weapon, battery on inmate, mutual combat, possession of slashing weapon, possession of sharpened instrument, and possession of razor blades.

9.      On July 16, 2002, Plaintiff received an RVR for delaying a peace officer in the performance of his duties.  He was found guilty of the offense and assessed a 90 day credit forfeiture.

10.     On August 30, 2002, Plaintiff received another RVR for battery on an inmate requiring the use of force.  Plaintiff was found guilty of the offense, assessed another 90 day credit forfeiture and a 90 day loss of certain privileges, and referred to the ICC for program review.

11.     On September 11, 2002, Plaintiff appeared before the ICC for a yard/program review. Plaintiff's regularly scheduled yard status had been suspended August 30, 2002, because of the battery on another inmate while on the sensitive needs yard #7.  The ICC elected to change Plaintiff from SNY #7 to walk-alone status based on the then pending RVR for battery.

12.     Prior to being placed on walk-alone status, Plaintiff had been receiving 10 hours per week of outdoor exercise on the sensitive needs yard.

13.     On September 22, 2002, Plaintiff filed an inmate appeal complaining that while on walk-alone status he was not receiving enough yard, and requested that he receive one hour minimum yard daily, with a total of 10 hours weekly, or be taken off of walk-alone status.

14.     Defendants Chapman and Lopez responded at the first level and explained in their written appeal response that Plaintiff's yard had been changed from sensitive needs to walk-alone based on his RVR for battery on an inmate on the sensitive needs yard, and that he would remain on walk-alone status pending the adjudication of the RVR and ICC review.  Plaintiff

5

1   was then advised in the written response that changing his yard back to sensitive needs would

2   not be possible at that time based on the safety and security of Plaintiff and others.  Plaintiff

3   was further advised in the response that while it is a priority to grant walk-alone inmates 10

4   hours a week on the yard, due to walk-alone yard construction delays and the unit's inability

5   to reasonably accommodate 10 hours minimally, the unit was unable to fully comply with

6   the 10 full hours of yard for all of the walk-alone inmates.  Finally, Plaintiff was advised in

7   the response that because of his safety concerns and the concerns of others, he would have

8   to remain on walk-alone.

9   15.   At the second level of appeal, Defendants Sullivan and Todd responded in writing by noting

10        that Plaintiff had been reassigned to the walk-alone exercise yard on September 11, 2002,

11        because of his behavior, and in accordance with established unit policies.  Plaintiff was

12        advised in the inmate appeal response that his yard program would be reevaluated upon

13        completion of the disciplinary process and a unit inquiry into the circumstances of the assault

14        that Plaintiff had committed on the sensitive needs yard.  Plaintiff was further advised in the

15        response that this procedure was consistent with the safe and orderly operation of the

16        exercise yard programs in the ad-seg unit, and the unit's precautionary and temporary

17        reassignment of inmates with similar circumstances.  Defendants noted in the response that

18        Plaintiff was found guilty of battery on an inmate which had occurred on the exercise yard

19        and that he was scheduled to appear before the ICC for a program review consisting of a yard

20        and housing evaluation. This evaluation would include a consideration of reassignment to

21        the reintegrated mix-sensitive needs exercise yard in accordance with departmental and

22        institutional procedures.  Defendants also advised Plaintiff in the response that unit staff was

23        making every effort to ensure that segregated inmates are allowed as much access to exercise

24        programs as possible. However, because of the physical design limitations and the large

25        numbers of inmates then assigned to walk-alone exercise yards, inmates were not able to

26        obtain the required amount of out-of-cell access to physical activities.  Inmates assigned to

27        the walk-alone exercise yard were being allotted as many hours per week as was then

28        possible and the time was supplemented with out-of-cell activities such as showers and legal

6

1    library access. Finally, Defendants noted in the response that Plaintiff had been allowed yard

2    access on October 5 and 19, 2002; and that on October 26, 2002, Plaintiff declined to

3    participate in his scheduled exercise program.

4    16.   Plaintiff then appealed to the Director's level of review.   The written response again

5    acknowledged that Plaintiff was not receiving the authorized 10 hours of outside exercise a

6    week.  Plaintiff was advised that California Code of Regulations, Title 15, Section 3343(h)

7    states that an inmate will be permitted 10 hours of exercise a week unless security and safety

8    consideration preclude such activity.   The third level reviewer noted that Plaintiff was a

9    walk-alone inmate, which reflected that he had enemy and safety concerns based on his past

10   behavior.  If Plaintiff had not had these safety concerns he could have received the required

11   hours by exercising with the regular SHU inmates.  Because of the need to separate Plaintiff

12   from the other inmates for his safety, and the safety of others, Plaintiff's access to exercise

13   was only on the limited walk-alone facilities.  Additional facilities were under construction

14   and upon completion, Plaintiff would have the required outside exercise time.

15   17.   Low and non-impact aerobic exercise could be done in Plaintiff's cell.

16   18.   Plaintiff's third level appeal was denied because CCI was taking steps in an attempt to

17   provide adequate exercise time; Plaintiff had placed himself in the position of needing a

18   sensitive needs environment; Plaintiff's actions had placed him in the SHU; and while on the

19   sensitive needs yard, Plaintiff had become involved in an incident in which he was charged

20   with battery.   The third level reviewer then determined that any difficulty Plaintiff was

21   having in receiving outside exercise was due to his own actions; and that while CDC will do

22   what is possible to provide Plaintiff with exercise, it would not do so at the expense of the

23   safety of inmates and staff.

24   19.   The ICC reviewed Plaintiff's SHU and yard assignment on November 7, 2002, elected to

25   retain Plaintiff in the CCI-SHU, and extended his expected release date to August 22, 2003.

26   The ICC also elected to reaffirm Plaintiff's walk-alone exercise yard status based on his

27   battery of an inmate on the sensitive needs exercise yard.

28   ///

20. The ICC reviewed Plaintiff's SHU and yard assignment on March 6, 2003, and elected to retain Plaintiff in the CCI-SHU pending his expected release date to August 22, 2003. The ICC also elected to reaffirm Plaintiff's walk-alone exercise yard status. In addition, Plaintiff's double-cell status was changed to single-cell status based on discussion and input from the mental health committee which stated that Plaintiff had an undifferentiated urge to harm others.

21. The ICC reviewed Plaintiff's SHU and yard assignment on June 19, 2003, elected to retain Plaintiff in the CCI-SHU pending his expected release date to August 22, 2003, and noted that Plaintiff is a drop out of the Northern Structure prison gang. The ICC also elected to change Plaintiff's walk-alone exercise yard to sensitive needs yard #7 based on Plaintiff's request and a review of his central file. In addition, Plaintiff's single-cell status was retained subject to reevaluation after programing on the sensitive needs exercise yard, based on a change in Plaintiff's medication which had left him feeling stable enough for a cell mate.

22. On July 7, 2003, Plaintiff was endorsed for the SVSP level IV sensitive needs yard upon the expiration of his SHU term on August 22, 2003. However, Plaintiff was to remain in ad-seg pending his transfer.

23. On August 13, 2003, Plaintiff was advised that due to an unavailability of space at SVSP sensitive needs yard, he would be retained at CCI ad seg, based on institutional safety and security concerns, pending his transfer.

24. On August 20, 2003, the ICC elected to retain Plaintiff in CCI-SHU on ad-seg status pending transfer to SVSP-SNY. The ICC also elected to change Plaintiff's single-cell status to double-cell and reaffirmed sensitive needs yard #7 based on Plaintiff's request and a review of his central file.

25. Plaintiff was transferred to SVSP on September 3, 2003.

     D.     <u>Eighth Amendment Conditions-of-Confinement Claim</u>

     On March 14, 2002, while housed at SATF, Plaintiff was placed in ad-seg after receiving an RVR for possession of an inmate manufactured stabbing weapon. (Undisputed Fact 4.) Plaintiff was found guilty and assessed a 15 month aggravated SHU term. (U.F. 5, 6 .) The term was aggravated

because Plaintiff had a prior RVR for the same offense and was found by the committee to have established a continued pattern of manufacturing slashing type weapons. (U.F. 6.) After being transferred to CCI to serve his SHU term, Plaintiff, who was a drop out from the Northern Structure, a prison gang, received a review on June 20, 2002, and was placed on SNY #7. (U.F. 7, 8.) In reviewing Plaintiff for placement, the committee noted Plaintiff had a past disciplinary history consisting of RVRs for possession of inmate weapon, battery on inmate, mutual combat, possession of slashing weapon, possession of sharpened instrument, and possession of razor blades. (U.F. 8.)

On July 16, 2002, Plaintiff received an RVR for delaying a peace officer in his duties, was found guilty, and was assessed a ninety-day credit forfeiture.[4] (U.F. 9.) On August 30, 2002, Plaintiff received another RVR for battery on an inmate requiring the use of force. (U.F. 10.) Plaintiff was found guilty, assessed a ninety-day credit forfeiture and a ninety-day loss of certain privileges, and referred to the ICC for review. (Id.)

Plaintiff's regularly scheduled yard had been suspended on August 30, 2002, due to the RVR for battery on an inmate. (U.F. 11.) On September 11, 2002, Plaintiff appeared before the ICC, which changed Plaintiff from SAY #7 to walk-alone status due to the pending R.R. (Id.) Prior to being placed on walk-alone status, Plaintiff had been receiving ten hours per week of outdoor exercise. (U.F. 12.)

On September 22, 2002, Plaintiff filed an inmate appeal grieving the lack of yard time and requesting he receive at least one hour per day with a minimum of ten hours per week, or be taken off walk-alone status. (U.F. 13.) Defendants Chapman and Lopez responded to the appeal at the first level of review and informed Plaintiff via the written inmate appeal response that he had been placed on walk-alone status due to the R.R. and would remain on that status pending adjudication of the R.R. (U.F. 14.) Defendants stated that due to the safety and security of Plaintiff and others, Plaintiff would have to remain on walk-alone status and his status could not be changed back to the sensitive needs yard at that time. (Id.) Plaintiff was informed in the appeal response that the unit ///

---

[4] Plaintiff refused to give up his morning meal tray because he wanted to see a sergeant. (Sullivan Dec., Attachment p. 14.)

9

1  was unable to comply fully with providing ten hours a week for all of the walk-alone inmates, due

2  to walk-alone yard construction delays and the unit's inability to do so. (Id.)

3       Defendants Sullivan and Todd responded to Plaintiff's inmate appeal at the second level of

4  review, reiterating the response given to Plaintiff by Defendants Chapman and Lopez, and stating

5  that Plaintiff had been found guilty of battery on an inmate and was scheduled to appear before the

6  ICC for a program review at which time he would have a yard and housing evaluation. (U.F. 15.)

7  Defendants stated in the response that due to physical design limitations and the large number of

8  walk-alone inmates, inmates were unable to obtain the required amount of out-of-cell physical

9  activities. (Id.) Defendants stated that the time was being supplemented with out-of-cell activities

10 such as showers and law library access. (Id.) In their response, Defendants stated that Plaintiff had

11 been allowed yard access on October 5 and 19, 2002, and had declined to participate in his scheduled

12 exercise program on October 26, 2002. (Id.) Plaintiff appealed to the third and final level of review,

13 and was informed, in part, that additional facilities were under construction and upon completion,

14 he would have the required number of hours of outdoor exercise. (U.F. 16.)

15      On November 7, 2002, Plaintiff received his review. (U.F. 19.) The committee retained

16 Plaintiff in the SHU, extended his release date to August 22, 2003, and retained him on walk-alone

17 status based on his battery of an inmate while on the sensitive needs yard. (Id.) Plaintiff received

18 another review on March 6, 2003, and was retained in the SHU on walk-alone status. (U.F. 20.) In

19 addition, Plaintiff was changed from double-cell status to single-cell status based on input from the

20 mental health committee that Plaintiff had an urge to harm others. (Id.) On June 19, 2003, Plaintiff

21 received another review. (U.F. 21.) The committee elected to retain Plaintiff in ths SHU until his

22 release date of August 22, 2003, but changed Plaintiff from walk-alone status back to SAY #7 based

23 on Plaintiff's request and a review of his file. (Id.) Plaintiff's single-cell status was retained pending

24 review following the yard change and a change in Plaintiff's medication. (Id.)

25      On July 7, 2003, Plaintiff was endorsed to SVSP level IV sensitive needs yard following the

26 expiration of his SHU term on August 22, 2003, but was to remain in ad-seg pending transfer. (U.F.

27 22.) On August 20, 2003, the ICC retained Plaintiff in ad-seg pending transfer, changed Plaintiff

28 ///

10

from single-cell status to double-cell status, and reaffirmed his placement on SAY #7. (U.F. 24.)
Plaintiff was transferred to SVSP on September 3, 2003. (U.F. 25.)

Defendants contend that Plaintiff received the requisite number of hours of outdoor exercise
while he was on the sensitive needs yard, but concede that between August 30, 2002 and June 19,
2003, while on walk-alone status, Plaintiff received limited outdoor exercise. (U.F. 12; Doc. 31, Ds'
Memo., 11:19-22.) Defendants contend that the unusual circumstances of limited physical plant for
walk-alone inmates and the large number of walk-alone inmates made outdoor exercise impossible.
(Ds' Memo., 11:22-27; Sullivan Dec., ¶¶16-18.)  In addition, Defendants contend that Plaintiff's
safety concerns, which required placement on a sensitive needs yard, Plaintiff's own actions resulting
in the imposition of a SHU term, and Plaintiff's disruptive and assaultive behavior while on the
sensitive needs yard led to his inability to receive the requisite number of hours of outdoor exercise.
(Id.) Defendants argue that Plaintiff's difficulty in receiving outdoor exercise was due to his own
actions, and that staff could not accommodate Plaintiff at the expense of the safety of other inmates
and staff. (Memo., 11:27-12:2; Sullivan Dec., ¶¶16, 18, 19, 21.)  Further, Defendants argue that
Plaintiff was still able to exercise within his own cell. (Memo., 12:2-3; Sullivan Dec., ¶20.)

Plaintiff contends that there were two sensitive needs yards in the building in which he was
housed where he could have participated in outdoor exercise. (Doc. 37, Opp., 6:17-23.)  Plaintiff
further contends that other buildings in the SHU had sensitive needs yards, and Defendants could
have accommodated him through a cell move to another building where he could have enjoyed
outdoor exercise.  (Id., 6:20-7:3.)  Plaintiff contends that every inmate on walk-alone status in
building 6 except for him was receiving yard, and disputes that there was an unusually large number
of inmates on walk-alone status.  (Id., 8:22-25.)  With respect to yard time offered on the dates in
October 2002, Plaintiff contends that during that time the yard was covered in snow and he did not
have appropriate winter clothing.  (Id., 9:24-10:2.)

Plaintiff contends that the only alleged enemy he had was on SAY #7 and that he could have
been accommodated by placement in another building.  (Id., 10:10-12.)  Plaintiff contends that the
incident was nothing more than a fist fight and Plaintiff could have resolved it if he had been given
the chance.  (Id., 11:21-26.)  Plaintiff contends that while on walk-alone status at CCI, he never

11

1   received yard time, thus belying Defendants' claim that staff attempted to provide yard time. (Id.,

2   10:21-25.)

3       To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

4   conditions must involve "the wanton and unnecessary infliction of pain . . . ." Rhodes v. Chapman,

5   452 U.S. 337, 347 (1981). Although prison conditions may be restrictive and harsh, prison officials

6   must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety.

7   Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237,

8   1246 (9th Cir. 1982). Where a prisoner alleges injuries stemming from unsafe conditions of

9   confinement, prison officials may be held liable only if they acted with "deliberate indifference to

10  a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

11      The deliberate indifference standard involves an objective and a subjective prong. First, the

12  alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511

13  U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official

14  must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S.

15  at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane

16  conditions of confinement only if he knows that inmates face a substantial risk of harm and

17  disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45. Prison officials

18  may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting

19  evidence of a reasonable, albeit unsuccessful, response to the risk. Id. at 844-45.

20      "'[S]ome form of regular outdoor exercise is extremely important to the psychological and

21  physical well being of the inmates.'" Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1995) (quoting

22  Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979)). Thus, "[the] deprivation of outdoor exercise

23  [can] constitute cruel and unusual punishment." Allen, 48 F.3d at 1087. While the temporary denial

24  of outdoor exercise with no medical effects is not a substantial deprivation, May v. Baldwin, 109

25  F.3d 557, 565 (9th Cir. 1997), in this Circuit, the deprivation of regular outdoor exercise for a period

26  of almost ten months is unquestionably sufficient to meet the objective requirement of the Eighth

27  Amendment analysis. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (denial of all outdoor

28  exercise for six weeks meets objective Eighth Amendment requirement); Allen, 48 F.3d at 1086-88

12

1  (forty-five minutes of outdoor exercise per week for six weeks meets objective Eighth Amendment
2  requirement).

3         Turning to the subjective requirement, Plaintiff was placed on walk-alone status following
4  his receipt of an R.R. for battery on an inmate while housed on a sensitive needs yard.  Plaintiff was
5  retained on walk-alone status pending adjudication of the R.R. and thereafter was retained on walk-
6  alone status until June 19, 2003.  Defendants' proffered reason for being unable to provide Plaintiff
7  with a minimum of ten hours per week of outdoor exercise while on walk-alone status is that the
8  institution had limited physical plant for walk-alone inmates and there was an unusually large
9  number of walk-alone inmates.

10        Defendants unquestionably have a need to preserve the safety and security of the institution,
11 which includes protecting staff and inmates.  Bell v. Wolfish, 441 U.S. 520, 546-47 (1979).  In the
12 discharge of this duty, Plaintiff was placed on walk-alone status after demonstrating his inability to
13 get along with another inmate while on the sensitive needs yard.  (U.F. 10, 11, 19.)  In addition,
14 Plaintiff has a disciplinary history including another battery on an inmate, mutual combat, and
15 possession of weapons.  (U.F. 8.)

16        Where Defendants run afoul of the Eighth Amendment is their inability to provide Plaintiff
17 with adequate outdoor exercise once he was placed on walk-alone status for ten months.  Although
18 safety and security concerns justify the need to separate Plaintiff from other inmates following his
19 demonstrated inability to get along on the sensitive needs yard, these concerns "do not explain why
20 other exercise arrangements were not made."  Spain, 600 F.2d at 200.  "The cost or inconvenience
21 of providing adequate facilities is not a defense to the imposition of a cruel punishment."  Id.  While
22 acknowledging the practical difficulties that arise in administering a prison, the Ninth Circuit has
23 rejected attempts by prison officials to justify a deprivation of adequate outdoor exercise as necessary
24 due to logistical problems.  Allen, 48 F.3d at 1088.  This is not the case where Plaintiff is alleging
25 he should have received 10 hours of outside exercise a week, but because of administration
26 problems, Plaintiff received fewer hours than the regulations require.   Plaintiff offers undisputed
27 evidence that Plaintiff received no outside exercise for 10 months.   The undisputed evidence
28 separates this situation from the situation where an inmate receives outside exercise but because of

the vast number of inmates on walk along status, the inmate receives fewer hours than the regulations require.

The Court rejects Defendants' argument that Plaintiff's situation is indistinguishable from that of inmate Samuel LeMaire in <u>LeMaire v. Maass</u>, 12 F.3d 1444 (9th Cir. 1993), a case in which the Ninth Circuit reversed the district court's finding that the deprivation of outside exercise for most of a five-year period violated the Eighth Amendment. This Court does not minimize the risk to the safety and security of the institution posed by Plaintiff on August 30, 2002, as a result of the fight he was involved in. Although Plaintiff characterizes it as a mere fist fight, Plaintiff does not dispute the description in the R.R., which documents a fight during which Plaintiff and another inmate remained determined to pursue the fight despite four rounds fired from a XM-1006 launcher and three wood baton rounds. (Sullivan Dec., Attach. p.19.) The fight was finally quelled through the use of pepper spray. (<u>Id</u>., p.20.)

However, there is no evidence in the record that Plaintiff's conduct and level of dangerousness was comparable to that exhibited by inmate LeMaire, who was a most violent and difficult to manage prisoner, extremely dangerous to both staff and other inmates. <u>LeMaire</u>, 12 F.3d at 1447-54. LeMaire posed "a grave security risk when outside his cell," <u>id</u>. at 1458, and the Ninth Circuit found that "[t]he record amply demonstrates that . . . LeMaire is a violent and dangerous person with no regard for other human beings," and was diagnosed with "antisocial personality disorder complicated by intermittent explosive disorder." <u>Id</u>. at 1449. In short, the record in <u>LeMaire</u> demonstrates that LeMaire was the worst of the worst, capable of extremely violent attacks on inmates and staff alike, and clearly a danger to anyone and everyone around him. Unlike in <u>LeMaire</u>, Defendants present no evidence that Plaintiff was denied regular outdoor exercise for approximately ten months while on walk-alone status was because he presented such a grave risk that he could not be accommodated or that while on this status, his own behavior caused him to lose his exercise privileges. <u>See</u> <u>Lopez</u>, 48 F.3d at 1087-88. Rather, although Plaintiff's own behavior landed him on walk-alone status, the reason given for the inability to accommodate Plaintiff while on this status was because of physical plant limitations and an unusually large number of walk-alone inmates who had to be accommodated. This justification is insufficient to entitle Defendants to

14

judgment as a matter of law on Plaintiff's Eighth Amendment claim against them.  <u>Allen</u>, 48 F.3d at 1088.

With respect to Defendants' conclusory argument that they had no control over the physical plant limitations or the number of inmates on walk-alone status, Defendants have submitted no evidence that they took any steps to provide Plaintiff with some other opportunity for outdoor exercise.  <u>See</u> <u>Lopez</u>, 203 F.3d at 1133.  Defendants merely explained to Plaintiff, via their inmate appeal responses, why he was on walk-alone status and why they could not provide him with the minimum ten hours of outdoor exercise while on that status.  This is insufficient to entitle Defendants to summary judgment on the basis that they were not involved with and could not have prevented the violation of Plaintiff's rights.  <u>See</u> <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1289 (9th Cir. 2000) (an officer can be held liable for failing to intercede if he had a "realistic opportunity" to do so).  Here, Defendants offer no evidence that they offered Plaintiff any outdoor exercise during a ten month period.  Accordingly, Defendants' motion for summary judgment on the merits of Plaintiff's claim must be denied.

E.      Qualified Immunity

Defendants also argue that they are entitled to qualified immunity, which shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established.  <u>Id</u>.  In determining whether the right was clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ."  <u>Id</u>. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Id</u>. at 202 (internal quotations and citation omitted).  In resolving these issues, the Court must view the

15

1  evidence in the light most favorable to Plaintiff and resolve all material factual disputes in favor of

2  Plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

3  As set forth in the preceding section of this order, Plaintiff's allegation that he was deprived

4  of outdoor exercise for almost a year unquestionably shows that the conduct complained of violated

5  the Eighth Amendment.  Lopez, 203 F.3d at 1132-33; Allen, 48 F.3d at 1086-88.  Further,  viewing

6  the evidence in the light most favorable to Plaintiff, Defendants were notified of the violation and

7  did not take any steps to prevent it.

8  Turning to the second step in the analysis, in 2002, when the deprivation at issue began, the

9  law was clearly established that (1) inmates have a protected right to receive adequate outdoor

10  exercise under the Eighth Amendment, (2) a deprivation of even six weeks meets the objective prong

11  of the Eighth Amendment analysis, and (3) neither the practical difficulties encountered in providing

12  outdoor exercise nor the denial of yard for the inmate's own protection can justify the deprivation.

13  Lopez at 1132-33; Allen at 1086-88; Spain, 600 F.2d at 199-200.  As previously set forth, although

14  Plaintiff was placed on walk-alone status as a disciplinary sanction, there is no evidence that he was

15  deprived of outdoor exercise while on this status due to disciplinary or safety issues.  See Allen at

16  1088.  Accordingly, Defendants' argument that it was not clearly established that prison officials

17  could not curtail outdoor exercise for extended periods of time due to disciplinary or safety reasons

18  is rejected.  Further, even if Plaintiff had been  denied yard for safety reasons, this reason would have

19  been an insufficient justification for the deprivation.  Lopez at 1133.  Finally, it was clearly

20  established in 2002 that if Defendants knew of the violation and failed to take steps to prevent it,

21  they could be held liable for the violation.  Cunningham, 229 F.3d at 1289; Taylor v. List, 880 F.2d

22  1040, 1045 (9th Cir. 1989).

23  In conclusion, qualified immunity protects "all but the plainly incompetent or those who

24  knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  By 2002, failing to provide

25  an inmate with regular outdoor exercise for a period of ten months due to the lack of adequate

26  facilities to accommodate the inmate constituted a knowing violation of the Eighth Amendment.

27  Lopez at 1133; Allen at 1088.  Accordingly, Defendants are not entitled to judgment as a matter of

28  law based on qualified immunity.

1    ///

2           F.      Conclusion and ORDER

3           Based on the foregoing, it is HEREBY ORDERED that Defendants' motion for summary

4    judgment, filed August 5, 2005, is DENIED in its entirety, and this matter is referred back to the

5    Magistrate Judge to be set for jury trial.

6

7    IT IS SO ORDERED.

8    **Dated:     March 21, 2006**                        **/s/ Anthony W. Ishii**
     0m8i78                                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28